2013 ND 94

**STATE of North Dakota, Plaintiff and Appellee**

v.

**John Joseph HOLLY, Defendant and Appellant.**

No. 20120324.

Supreme Court of North Dakota.

June 19, 2013.

Rehearing Denied July 18, 2013.

Sean B. Kasson, Assistant State's Attorney, Minot, N.D., for plaintiff and appellee.

Eric P. Baumann, North Dakota Public Defenders' Office, Minot, N.D., for defendant and appellant.

MARING, Justice.

[¶ 1] John Holly appeals the trial court's criminal judgments finding him guilty of the following counts: (1) possession of marijuana, greater than one ounce; (2) possession of a schedule III controlled substance; (3) possession of drug paraphernalia, other than marijuana; (4) possession of drug paraphernalia, marijuana; (5) possession of Psilocyn; (6) possession of a schedule IV controlled substance; and (7) possession of drug paraphernalia, other than marijuana. We conclude the search of Holly's vehicle was lawful; sufficient evidence existed on the record to sustain a conviction of guilt for counts 5, 6, and 7; and, the trial court did not err in finding, sua sponte, Holly guilty of a lesser-included offense. We affirm the criminal judgments which are based on the evidence found in Holly's vehicle. We conclude the nighttime search warrant of Holly's residence was not supported by separate probable cause, and the evidence found in Holly's residence must be suppressed. We reverse the criminal judgments which are based on the evidence found in his residence. We remand for the trial court to amend its order denying Holly's motion to suppress and the criminal judgments consistent with this opinion.

I

[¶ 2] On February 7, 2011, North Dakota Bureau of Criminal Investigation Agent Rob Browne received information from Timothy Marquez and Micah Sesseman that Holly would be traveling to Montana and returning to Minot, North Dakota, with marijuana and unknown prescription drugs. Sesseman identified himself as Holly's current roommate. Sesseman informed Agent Browne that Holly would be traveling in a white Ford Ranger with Texas license plates; Holly's girlfriend, a third roommate, would be driving the vehicle; and, Holly would be returning to Minot the following evening. Agent Browne relayed this information to Deputy Sheriff Willie Graham working with the Ward County Narcotics Task Force.

[¶ 3] On February 8, 2011, Deputy Graham met with Sesseman at the residence he and Holly occupied. Sesseman again relayed information regarding Holly's travel plans. He also informed Deputy Graham that Holly frequently smoked marijuana in his bedroom. While at the residence, Sesseman entered Holly's bedroom. From Deputy Graham's vantage point in the living room, he observed a multi-colored glass smoking device, which he believed to be a bong, sitting on a dresser in Holly's bedroom.

[¶ 4] After his conversation with Sesseman, Deputy Graham sought a search warrant for Holly's vehicle and residence. The magistrate issued Deputy Graham a search warrant allowing law enforcement to search Holly's vehicle and residence during the "daytime." The warrant was

later modified at the request of Deputy Graham to "anytime."

[¶ 5] On February 8, 2011, at 10:14 p.m., Deputy Graham and other officers executed the search warrant for the vehicle and residence. There is no dispute that the search warrant was executed during the nighttime. The officers seized the following from Holly's vehicle: two plastic bags of marijuana; one plastic bag containing approximately twenty-six pills of Clonazepam; one plastic bag of Psilocyn, hallucinogenic mushrooms; and one glass smoking device. In Holly's residence, the officers seized: one plastic bag containing aluminum foil that contained Testosterone Propionate; one grey digital scale with marijuana residue; one multi-colored glass smoking device; one plastic tub containing various size plastic bags and marijuana residue; and one metal smoking device. Holly was subsequently charged with six counts of possession of controlled substances and drug paraphernalia and one count of possession with intent to deliver marijuana.

[¶ 6] On April 18, 2011, Holly moved to suppress the evidence seized, arguing the warrant affidavit lacked probable cause. Specifically, Holly argued (1) the warrant affidavit did not contain information establishing the reliability of Sesseman as an informant; (2) Deputy Graham's observation of the multi-colored, glass smoking device constituted an illegal search; and (3) Deputy Graham lacked probable cause to believe the glass smoking device was in fact a bong. Lastly, Holly argued the warrant affidavit did not establish the separate probable cause required for the issuance of an "anytime" warrant. After holding a hearing on May 23, 2011, the trial court denied Holly's motion to suppress.

[¶ 7] Holly then moved to suppress the evidence based on the warrant affidavit's reference to "six pounds" of marijuana. Holly argued Deputy Graham intentionally or with reckless disregard for the truth misled the magistrate in obtaining the search warrant by stating that Holly would be transporting six pounds of marijuana. The trial court held a hearing on October 27, 2011. The trial court denied Holly's motion, concluding that, although the information was later determined to be false, Deputy Graham did not intentionally or with reckless disregard for the truth mislead the magistrate.

[¶ 8] Holly waived his right to a jury trial. At a bench trial, the trial court found Holly guilty of all six counts of possession of controlled substances and possession of drug paraphernalia. The trial court found that the State failed to prove beyond a reasonable doubt that Holly possessed marijuana with the intent to deliver. The trial court dismissed the charge, but found the State had proven beyond a reasonable doubt the lesser-included offense of possession of a controlled substance, namely possession of more than one ounce of marijuana.

[¶ 9] Holly appeals arguing the trial court erred in denying his motions to suppress, denying his motion for a judgment of acquittal, and finding him guilty of the lesser-included offense.

II

[¶ 10] Holly argues the trial court erred in denying his motions to suppress. He argues the warrant affidavit lacked sufficient probable cause and the search of his residence and vehicle violated the U.S. Const. Amend. IV and N.D. Const. art. I, § 8. We conclude the warrant affidavit contained sufficient separate probable cause to issue a nighttime search warrant for Holly's vehicle. We conclude, however, the warrant affidavit did not contain sufficient separate probable cause to search Holly's residence at night, and

therefore, the evidence found in Holly's residence must be suppressed.

[¶ 11] We affirm a trial court's order denying a motion to suppress evidence if "there is sufficient competent evidence fairly capable of supporting the trial court's findings, and the decision is not contrary to the manifest weight of the evidence." *State v. Beane,* 2009 ND 146, ¶ 8, 770 N.W.2d 283. Conflicts in testimony are resolved in favor of affirmance, as the trial court is in a superior position to assess the witnesses' credibility. *Id.* "Questions of law are fully reviewable on appeal, and whether a finding of fact meets a legal standard is a question of law. The determination of whether probable cause exists to issue a search warrant is a question of law." *State v. Johnson,* 2011 ND 48, ¶ 9, 795 N.W.2d 367 (citations and quotations omitted). We give deference to the trial court's determination of probable cause if a substantial basis for the conclusion exists. *Johnson,* at ¶ 10. "Marginal cases are decided in favor of the [trial court's] determination." *Id.*

[¶ 12] "The Fourth Amendment of the United States Constitution and Article I, section 8 of the North Dakota Constitution protect against unreasonable searches and seizures." *Id.* at ¶ 10. A search warrant may be obtained upon a showing of probable cause. *Id.* " 'Probable cause exists "if the facts and circumstances relied on by the magistrate would warrant a person of reasonable caution to believe the contraband . . . will be found in the place to be searched." ' " *Id.* (quoting *State v. Kieper,* 2008 ND 65, ¶ 7, 747 N.W.2d 497 (quoting *State v. Nelson,* 2005 ND 59, ¶ 3, 693 N.W.2d 910)). We apply the totality-of-the-circumstances test to determine whether the information before the magistrate was sufficient to establish probable cause:

Although each piece of information may not alone be sufficient to establish probable cause and some of the information may have an innocent explanation, probable cause is the sum total of layers of information and the synthesis of what the police have heard, what they know, and what they observed as trained officers.

*State v. Guthmiller,* 2002 ND 116, ¶ 10, 646 N.W.2d 724 (quotation omitted).

A

[¶ 13] Holly argues the warrant affidavit failed to contain information establishing Sesseman's reliability as an informant. Holly argues Sesseman was a confidential informant and, therefore, his reliability should have been established.

[¶ 14] There are three types of informants: citizen, confidential, and anonymous. *State v. Roth,* 2004 ND 23, ¶ 9, 674 N.W.2d 495 [hereinafter "*Roth I* "]. "A citizen informant is 'someone who volunteers information, does not want anything in return for the information, and is not at risk or in fear of going to jail.' " *Id.* at ¶ 10 (quoting *State v. Rangeloff,* 1998 ND 135, ¶ 4 n. 3, 580 N.W.2d 593). Citizen informants are presumed reliable. *Roth I,* at ¶ 10. " '[T]heir reliability should be evaluated from the nature of their report, their opportunity to hear and see the matters reported, and the extent to which it can be verified by independent police investigation.' " *Id.* (quoting *State v. Frohlich,* 506 N.W.2d 729, 733 (N.D.1993)).

[¶ 15] A confidential informant is a person known to the police, but whose identity is concealed from the magistrate. *Roth I,* 2004 ND 23, ¶ 11, 674 N.W.2d 495. A confidential informant's identity is being protected, differing significantly from a citizen informant. *Id.* Here, the warrant affidavit identified Sesseman by name and as Holly's roommate at 15

11th Ave, N.W., Minot, North Dakota. The warrant affidavit also stated that Sesseman had been Holly's roommate for a period of one month and that he had seen Holly smoking marijuana in their residence. It stated that Holly told Sesseman that he was going to Montana to buy marijuana and other prescription drugs to transport back to Minot. Sesseman told Agent Browne and Deputy Graham that Holly drove a white Ford Ranger with Texas license plates.

[¶ 16] Holly argues that Sesseman received a reward for the information he provided law enforcement making him a confidential informant. Sesseman testified that he had not received a reward or been told he would receive a reward when he spoke with Deputy Graham. Sesseman was offered a $300.00 reward after Holly was arrested.

[¶ 17] The record contains no evidence that Sesseman was presently involved in criminal activity or enjoyed the confidence of criminals. He provided his name, address, and unsolicited information to law enforcement without seeking anything in return. The detailed information Sesseman provided, including the make, model, color, and license plates of Holly's car, is evidence of Sesseman's reliability. Therefore, we conclude Sesseman is a citizen informant and his reliability is presumed.

### B

[¶ 18] Holly argues Deputy Graham violated his right to be free from unreasonable searches and seizures by allegedly searching his bedroom.

[¶ 19] The Fourth Amendment requires that all searches of a person's residence be reasonable. U.S. Const. amend. IV. Generally, a search of a person's residence must be accompanied by a warrant. *Illinois v. Rodriguez*, 497 U.S. 177, 184–86, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990); *State v. Hurt*, 2007 ND 192, ¶ 6, 743 N.W.2d 102. However, a search is reasonable if a person with the proper authority consents to the search. *Rodriguez*, 497 U.S. at 184–86, 110 S.Ct. 2793; *State v. Zimmerman*, 529 N.W.2d 171, 174 (N.D.1995). A third party who has common authority over the premises may consent to a search absent the consent of the other occupant. *Id.* Common authority is based on "mutual use of the premises by persons generally having control over or joint access to the property for most purposes." *Id.* The rationale behind this decision is that "it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." *Hurt*, at ¶ 7. Third-party consent does not, however, extend to a search of the premises under another person's exclusive control. *State v. Swenningson*, 297 N.W.2d 405, 407 (N.D.1980). Further, a search conducted by a private individual does not violate the Fourth Amendment. *Walter v. United States*, 447 U.S. 649, 656, 100 S.Ct. 2395, 65 L.Ed.2d 410 (1980); *State v. Seglen*, 2005 ND 124, ¶ 6, 700 N.W.2d 702.

[¶ 20] The multi-colored, glass smoking device was in Holly's bedroom on top of Holly's dresser. Deputy Graham observed the glass smoking device from his vantage point in the living room when Sesseman opened the door to enter Holly's bedroom. Deputy Graham testified that he did not enter Holly's bedroom, nor did he ask Sesseman to enter Holly's bedroom. At the May 23, 2011, suppression hearing, Deputy Graham testified to the following:

> A. While I was sitting in the living-room [sic], the subject that ... was giving us the information went into the bedroom that he said was shared by Mr. Holly and the female juvenile. And

when he opened the door, I could see [the glass smoking device] from the—from where I was sitting in the livingroom [sic].

[¶ 21] Sesseman, as Holly's roommate, was a third party who had common authority over the residence's living room. Therefore, he properly consented to Deputy Graham's presence in the living room. From Deputy Graham's vantage point in the living room, he observed the glass smoking device in plain view from a place he was lawfully entitled to be. *See State v. Albaugh*, 2007 ND 86, ¶ 18, 732 N.W.2d 712 (holding officers may seize contraband without a warrant "if the officers are lawfully in a position from which they can view the object" and it is readily apparent the item is contraband). Deputy Graham's observation of the glass smoking device was not the result of an illegal search.

### C

[¶ 22] Holly argues the warrant affidavit's characterization of the glass smoking device as a "bong" and the inclusion of the phrase "six pounds" of marijuana were false and misleading.

■■■ [¶ 23] When a defendant alleges false or misleading statements have been made in a warrant affidavit, we address the issue under the standard set forth by the United States Supreme Court in *Franks v. Delaware*, 438 U.S. 154, 155–56, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). *Nelson*, 2005 ND 59, ¶ 4, 693 N.W.2d 910. Under *Franks*, a false or misleading statement may result in suppression of evidence if probable cause for the search warrant was otherwise lacking:

"Where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false

statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request. In the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit."

*Nelson*, at ¶ 4 (quoting *Franks*, 438 U.S. at 155–56, 98 S.Ct. 2674).

[¶ 24] For probable cause to be established, "truthful" does not mean that every fact recited is in fact correct. *Franks*, at 165, 98 S.Ct. 2674. The information must be " 'truthful' in the sense that the information put forth is believed or appropriately accepted by the affiant as true." *Id.* "A false statement under *Franks* is 'one that misleads a neutral and detached magistrate into believing the stated facts exist, and those facts in turn affect the magistrate's evaluation of whether or not there is probable cause.' " *State v. Ebel*, 2006 ND 212, ¶ 21, 723 N.W.2d 375 (quoting *State v. Donovan*, 2004 ND 201, ¶ 7, 688 N.W.2d 646).

■■■ [¶ 25] The defendant must establish the alleged false statement was intentionally made or with reckless disregard for the truth. *Donovan*, 2004 ND 201, ¶ 8, 688 N.W.2d 646. "Reckless disregard for the truth may be proved inferentially from circumstances evincing obvious reasons to doubt the veracity of the allegations." *Id.* "Mere negligence by the affiant, however, does not constitute reckless disregard for the truth." *Id.* We review whether the defendant met his burden un-

der a clearly erroneous standard. *Id.* A finding of fact is clearly erroneous if it is induced by an erroneous view of the law, if there is no evidence to support it, or if, although there is some evidence, on the entire evidence, we are left with a definite and firm conviction a mistake has been made. *Id.*

### 1.

[¶ 26] Holly argues the characterization of the glass smoking device as a bong in the warrant affidavit misled the magistrate.

[¶ 27] The warrant affidavit stated, "Graham observed a multi-colored glass smoking device, commonly called a bong" sitting in Holly's bedroom. The warrant affidavit also indicated that Holly and a third roommate frequently used Holly's bedroom to smoke marijuana. Based on Deputy Graham's observation of the glass smoking device, information regarding Holly smoking marijuana in his bedroom, and knowledge as a narcotics task force agent, he reasonably believed the glass smoking device was a bong. Therefore, we conclude the trial court did not err in finding Deputy Graham reasonably believed the multi-colored glass smoking device was a bong and that he did not intentionally or with reckless disregard for the truth mislead the magistrate.

### 2.

[¶ 28] The State concedes the warrant affidavit contained an incorrect statement regarding the quantity of marijuana. However, the State argues that, at the time Deputy Graham attested to the information, he reasonably believed it to be true.

[¶ 29] The warrant affidavit said, "Sesseman states that John Holly told him that he was going to Whitefish, MT. While there, Holly was planning to purchase six pounds of marijuana." However-

er, the record indicates several months after the execution of the search warrant, Marquez, an informant who originally was unnamed, told law enforcement that when he initially contacted law enforcement he did not know the exact quantity of marijuana Holly would be transporting, and that he simply made up the amount. Sesseman denied making any statement to law enforcement with regard to the quantity of marijuana.

[¶ 30] Holly moved to suppress the evidence seized, arguing the warrant affidavit's reference to "six pounds" of marijuana misled the magistrate. At the supplemental suppression hearing, held on October 27, 2011, Marquez, testified that he made the initial call to law enforcement regarding Holly's drug activities. Marquez testified that he spoke with Agent Browne and told him that Holly would be transporting six pounds of marijuana from Montana to Minot. Marquez then testified that Sesseman spoke with Agent Browne to provide detailed information about Holly's vehicle and travel plans.

[¶ 31] Sesseman testified he did not mention to Deputy Graham the exact amount of marijuana Holly would be transporting. He testified that he knew Marquez had told law enforcement Holly would be transporting six pounds of marijuana, but he never affirmatively said it was six pounds. He also testified that he did not correct Marquez's statement to law enforcement.

[¶ 32] Deputy Graham, however, testified that he specifically remembered talking to Sesseman at the apartment about the quantity of marijuana Holly would be transporting:

> Q. Okay. Now, are you saying in regard to this that the "six pound" statement from Mr. Sesseman was made

while at the residence and also on the phone? Or just simply at the residence?

A. I'm saying for sure at the residence. I'm not sure about the phone. But the residence for sure. Because that would be where I talked to him about what was going on.

. . . .

THE COURT: Deputy Graham, do you recall exactly what Mr. Sesseman did say to you at his residence about any quantity of marijuana being brought back, or supposedly being brought back, by Mr. Holly to North Dakota? Do you recall exactly what he said to you?

WITNESS GRAHAM: I do not recall the exact words. I do recall discussing it and I believe we discussed the amount that he had said the night before. And I think I verified it with him by him saying the six pounds.

THE COURT: But you're not—

WITNESS GRAHAM: I—I really do believe he said—told me six pounds. I—

THE COURT: But you're not entirely sure, is what you're saying?

WITNESS GRAHAM: Correct.

THE COURT: And I recognize we're several months removed from this incident. So you're not entirely sure that that's—

WITNESS GRAHAM: Correct, but I think he did verify the six pounds.

██ [¶ 33] The trial court found "it was entirely reasonable for Graham to have deduced that the 'six (6) pounds of marijuana' information came from Sesseman." We give the trial court deference in assessing witnesses' credibility and weighing testimony, and conflicts in testimony are resolved in favor of affirmance. *Beane*, 2009 ND 146, ¶ 8, 770 N.W.2d 283. Therefore, we conclude the trial court did not err in finding Deputy Graham's testimony credible and that Deputy Graham did not intentionally or with reckless disregard for the truth, include false information in the warrant affidavit.

D

[¶ 34] Holly argues the warrant affidavit failed to show sufficient separate probable cause for authorizing a nighttime search warrant and the evidence seized during the search should be suppressed under the exclusionary rule.

[¶ 35] Under N.D.R.Crim.P. 41(c)(1)(E), a warrant must be served during the daytime unless, based on reasonable cause, it is authorized to be executed at times other than daytime. Under N.D.R.Crim.P. 41(h)(2)(B), " '[d]aytime' means the hours from 6:00 a.m. to 10:00 p.m. according to local time." We have determined that reasonable cause and probable cause are interchangeable. *State v. Knudson*, 499 N.W.2d 872, 875 (N.D. 1993). Therefore, a nighttime, 10:01 p.m. to 5:59 a.m., search warrant requires a separate showing of probable cause necessitating the need to execute the warrant at a time other than the daytime. *State v. Fields*, 2005 ND 15, ¶ 9, 691 N.W.2d 233. A variety of circumstances may justify the separate probable cause necessary for a nighttime search. *Id.* at ¶ 10.

██ [¶ 36] The State argues a nighttime search warrant was necessary in this case to allow the officers to wait at Holly's residence and seize the evidence when Holly arrived in Minot from Montana. The State does not argue officer safety or any other justification for a nighttime search warrant existed. This Court has held that to establish separate probable cause for a nighttime search the mere presence of drugs is not enough:

An officer must set forth some facts for believing the evidence will be destroyed

other than its mere existence. Mere allegations about the presence of drugs do not lead to the inference that the drugs are easily disposable.

. . . .

Necessity for a nighttime search exists where there is a reasonable possibility that the fruits, instrumentalities or evidence of crime sought would not be expected to be at the searched premises during the day or might be removed or dissipated if the search is delayed.

*Roth v. State*, 2007 ND 112, ¶¶ 21–22, 735 N.W.2d 882 [hereafter *"Roth III"*] (citations and quotation omitted).

[¶ 37] Under N.D.R.Crim.P. 41(c)(1)(A), "[a] warrant other than a warrant on oral testimony under Rule 41(c)(2) may issue only on an affidavit or affidavits sworn to or sworn recorded testimony taken before a state or federal magistrate and establishing the grounds for issuing the warrant." Any unsworn testimony may not be the basis for probable cause for the issuance of the search warrant. *State v. Schmeets*, 278 N.W.2d 401, 405–06 (N.D. 1979).

[¶ 38] At the May 23, 2011, suppression hearing, Deputy Graham testified that the initial warrant only allowed for a daytime search, but was revised to allow for a nighttime search:

Q. Okay. Now, in regard to the search warrant. The initial application and, basically, the search warrant, itself, requested a daytime search warrant. Correct?

A. Correct.

Q. And the initial search warrant signed by Judge Hagar in this matter just simply allowed a search during the daytime, correct?

A. Correct.

Q. Okay. Essentially, around the time that the search warrant was to be exe-cuted it was determined that a nighttime search warrant would be applied for, correct? Or it would be asked for?

A. Could you state that again? What time?

Q. Well, at some point—at some point it was determined that you would request a nighttime search warrant, or that a nighttime search warrant would be requested. Correct?

A. Yes, sir.

Q. Okay, and at that point Officer Browne went back to Judge Hagar?

A. Nope. I did.

Q. You did?

A. Yes, sir.

Q. Oh, you were the—okay. And you went back to Judge Hagar and, essentially, at that point Judge Hagar crossed out the "in the daytime" provision on the search warrant and wrote in "anytime" and initialed by that. Correct?

A. That is correct.

Q. Okay. All right. Now, when you went back to speak with Judge Hagar to request the anytime provision—I guess I'd ask the State, there was no recording made of that, correct?

A. No, sir.

Q. Okay, and it wasn't sworn statements, anything along those lines, correct?

A. No, sir.

[¶ 39] At the October 27, 2011, suppression hearing, Deputy Graham again testified as to the request for the nighttime warrant:

WITNESS GRAHAM: The revision was to take—to change it from a daytime warrant to a nighttime/anytime warrant.

THE COURT: Okay. What prompted Judge Hagar to make that revision?

WITNESS GRAHAM: When we—I discussed with him the fact of what was coming in and the time frame of when they would possibly would be getting here.

THE COURT: So that was the only, let's say, justification you presented for wanting a nighttime warrant?

WITNESS GRAHAM: Yes, sir.

. . . .

THE COURT: But did you specifically request that the warrant be an anytime warrant?

WITNESS GRAHAM: Yes, sir.

[¶ 40] Deputy Graham testified that he made unsworn statements to the magistrate requesting the warrant be executed at night. The procedure followed in making such a request was in direct violation of N.D.R.Crim.P. 41(c) and is not condoned. Therefore, any testimony regarding the exchange between the magistrate and Deputy Graham will not be taken into consideration in deciding the sufficiency of probable cause for the search warrant. We may rely only on the face of the affidavit for determining whether separate probable cause existed for the issuance of this nighttime search warrant. *See Schmeets*, 278 N.W.2d at 405–06.

[¶ 41] The search warrant allowed for the search of Holly's residence, persons at the residence, and Holly's vehicle. In support of the nighttime search warrant, the relevant parts of the affidavit indicated the following: (1) Holly would be transporting marijuana and other unknown prescription drugs in his white Ford Ranger; (2) "Holly advised Sesseman that he . . . would be leaving Whitefish, MT in the morning hours of 2/8/2011 and expected to arrive in Minot during the evening hours"; (3) Holly was planning to purchase six pounds of marijuana and some prescription drugs to bring back to Minot; (4) "[b]ased upon [Deputy Graham's] training and experi-

ence vehicles are often used for storage and hiding drugs and drug related paraphernalia"; (5) Sesseman witnessed Holly smoking marijuana in the residence; and (6) Deputy Graham "observed a multi-colored glass smoking device, commonly called a bong, sitting on a dresser along the west wall of [Holly's] bedroom" through an open door.

1.

■▬ [¶ 42] We conclude, under the totality of the circumstances, sufficient evidence existed to support a finding of probable cause for a nighttime search warrant of Holly's vehicle. The warrant affidavit indicated that Holly's roommate knew Holly would be traveling to Whitefish, Montana, to purchase marijuana and other prescription drugs. It also noted, Holly would be transporting six pounds of marijuana and other illegal drugs in his vehicle, a white Ford Ranger, and he would be returning to Minot during the evening hours of February 8, 2011. The warrant affidavit also stated, "based upon this affiant's training and experience vehicles are often used for storage and hiding drugs and drug related paraphernalia."

[¶ 43] Therefore, under the totality of the circumstances, the facts in this affidavit established that "a person of reasonable caution [would] believe the contraband" would be found in the white Ford Ranger. *See Johnson*, 2011 ND 48, ¶ 10, 795 N.W.2d 367. Because a vehicle's inherent mobility provides exigent circumstances to reasonably infer that the illegal contraband would not be found again if law enforcement must wait and procure a search warrant, probable cause for a nighttime search existed. *See State v. Zwicke*, 2009 ND 129, ¶ 11, 767 N.W.2d 869; *Maryland v. Dyson*, 527 U.S. 465, 467, 119 S.Ct. 2013, 144 L.Ed.2d 442 (1999) (holding exigent circumstances need not exist, be-

yond a vehicle's inherent mobility, and probable cause to believe the vehicle contains contraband).

[¶ 44] The inherent mobility of the vehicle provided the nighttime probable cause to infer the illegal drugs would not be expected to be in Holly's vehicle the following day or might be removed if the search was delayed to daytime. Therefore, under the totality of the circumstances, the facts presented in the warrant affidavit provided probable cause for a nighttime search of Holly's vehicle.

2.

■ [¶ 45] We conclude the warrant affidavit did not, however, establish sufficient separate probable cause demonstrating the need for a nighttime warrant to search Holly's residence. We have rejected a per-se rule justifying the issuance of nighttime search warrants in drug cases. *See Fields,* 2005 ND 15, ¶ 10, 691 N.W.2d 233. The mere presence of drugs does not allow the inference the drugs are easily disposable. *Id.* The warrant affidavit "must set forth some facts for believing the evidence will be destroyed other than its mere existence." *Id.*

[¶ 46] The State argues the need for a nighttime search warrant existed based on the premise that law enforcement officers wanted to intercept the evidence as "the actual delivery/transportation of the marijuana into Minot" occurred and, therefore, "it [was] imperative that [law enforcement] act at the time of arrival." The State relies on *Roth III* to support this argument. In *Roth III,* this Court held probable cause existed for a nighttime search warrant:

> We conclude the information contained in Deputy Bitz's affidavit provided sufficient probable cause to justify a nighttime search. The confidential informant stated that Roth manufactured methamphetamine in his basement, and

surveillance established that there was activity in the basement during the late nighttime hours. Surveillance also established that at least one other person connected with drug activity was in the residence at the time. These facts, taken together, indicate that Roth was likely manufacturing methamphetamine in his home at nighttime. Therefore, in order for law enforcement to catch Roth in the process of manufacturing methamphetamine, the search needed to be conducted at nighttime rather than in the daytime. If law enforcement searched Roth's residence at a time when he was not manufacturing, it was reasonably probable that much of the evidence of the manufacturing process, including the methamphetamine itself, would have been removed from the premises. Nor is the evidence as convincing when the actual manufacturing is not in process. Section 19–03.1–23.1, N.D.C.C., provides an increased penalty for the manufacture or distribution of a controlled substance within one thousand feet of a school, but not for possession with intent. *See State v. Dennis,* 2007 ND 87, ¶ 1, 733 N.W.2d 241. For these reasons, law enforcement officers have a legitimate interest in catching a suspect in the act of manufacturing drugs.

2007 ND 112, ¶ 27, 735 N.W.2d 882.

[¶ 47] However, we cannot rely on Deputy Graham's assertion that the time frame for when Holly would be arriving in Minot establishes the separate probable cause necessary for a nighttime search warrant. This information was not included in the warrant affidavit nor was it provided to the magistrate under sworn testimony. Therefore, unlike *Roth III,* here, the warrant affidavit did not contain particularized facts indicating the need to apprehend and search Holly's

residence at the time of the alleged commission of a crime. Also, the warrant affidavit did not contain any information that the drugs would be moved from the vehicle into Holly's residence. The warrant affidavit established only the presence of a "bong" in the residence and that Holly smoked marijuana in the residence. It lacked any information to establish the evidence would be destroyed or quickly removed from the residence prior to the execution of a daytime warrant. We conclude the facts in this warrant affidavit do not support a separate finding of probable cause for a nighttime search warrant of Holly's residence and the search of Holly's residence was unreasonable. Therefore, the evidence obtained from the residence as a result of the search was illegally obtained.

[¶ 48] Evidence seized as a result of an unlawful search in violation of the Fourth Amendment must be suppressed under the exclusionary rule. *State v. Handtmann*, 437 N.W.2d 830, 836–37 (N.D.1989); *see Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). When an unlawful search and seizure occurs, "the exclusionary rule operates as a judicial sanction against law enforcement intrusion into an individual's Fourth Amendment right to privacy." *Handtmann*, at 837. "[T]he exclusionary rule acts to deter police misconduct in making unreasonable searches and seizures, and to bolster judicial integrity by not allowing convictions based on unconstitutionally obtained evidence." *State v. Wahl*, 450 N.W.2d 710, 714 (N.D.1990). Because the nighttime search of Holly's residence was unlawful, we conclude the evidence seized must be suppressed.

[¶ 49] The State, however, argues that if sufficient separate probable cause did not exist to support a nighttime search warrant, the evidence should not be suppressed because the good-faith exception and the inevitable-discovery doctrine to the exclusionary rule apply.

a.

[¶ 50] The United States Supreme Court recognized the good-faith exception in *United States v. Leon*, 468 U.S. 897, 922, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). Under the federal exclusionary rule, the Court in *Leon* held that evidence should not be excluded when an officer acts "in good faith upon objectively reasonable reliance on the magistrate's probable cause determination." *Kieper*, 2008 ND 65, ¶ 15, 747 N.W.2d 497 (citing *Leon*, 468 U.S. at 922, 104 S.Ct. 3405). Whether an officer's reliance is objectively reasonable turns on " 'whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization.' " *State v. Herrick*, 1999 ND 1, ¶ 15, 588 N.W.2d 847 (quoting *Leon*, 468 U.S. at 922 n. 23, 104 S.Ct. 3405) [hereinafter "*Herrick II*"]. An officer's reliance on the magistrate's authorization is not objectively reasonable, and suppression remains appropriate, in four situations:

(1) when the issuing magistrate was misled by false information intentionally or negligently given by the affiant; (2) when the magistrate totally abandoned her judicial role and failed to act in a neutral and detached manner; (3) *when the warrant was based on an affidavit "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"*; and (4) when a reasonable law enforcement officer could not rely on a facially deficient warrant.

*Herrick II*, at ¶ 15 (emphasis added) (citing *Leon*, at 923, 104 S.Ct. 3405).

[¶ 51] A nighttime search warrant must be made on a showing of separate probable cause necessitating the warrant be executed at a time other than the day-

time. *Roth III*, 2007 ND 112, ¶ 22, 735 N.W.2d 882; *see* 2 Wayne R. LaFave, *Search and Seizure*, § 4.7(b), at 833 (5th ed.2012). Our Court has concluded separate probable cause exists for a nighttime search warrant when the warrant affidavit contains particularized facts indicating the contraband would be easily destroyed or quickly removed from the premises if law enforcement waited until daytime to execute the search warrant. *See, e.g., State v. Torkelsen*, 2008 ND 141, ¶ 38, 752 N.W.2d 640 (probable cause existed when the warrant affidavit established law enforcement had reason to believe the parents would destroy or remove evidence of their son's alleged involvement in a murder to protect him if the search warrant was not executed at nighttime); *Roth III*, 2007 ND 112, ¶ 28, 735 N.W.2d 882 (probable cause existed when the warrant affidavit established particularized facts that the suspect manufactured methamphetamine during the nighttime); *see also* LaFave, *supra*, § 4.7(b) at 833–34 ("A showing of such necessity would most commonly be based upon a justified apprehension that the evidence within the house would be removed, hidden or destroyed before morning.") (quotation and footnote omitted). *But see Fields*, 2005 ND 15, ¶ 12, 691 N.W.2d 233 (separate probable cause did not exist when the warrant affidavit only alleged the suspect kept "odd hours").

[¶ 52] Here, the warrant affidavit, with regard to the residence, stated Holly smoked marijuana in his bedroom and that Deputy Graham had observed a "bong" in Holly's bedroom. The warrant affidavit failed to set forth any factual basis alleging drugs or paraphernalia would be easily destroyed or quickly removed from the residence. "Merely alleging the presence of [drugs] does not allow one to infer the drugs [are] easily disposable." *State v. Utvick*, 2004 ND 36, ¶ 21, 675 N.W.2d 387. We have consistently held that more than conclusory statements and suspicions are needed for a nighttime search warrant. *Roth III*, 2007 ND 112, ¶ 25, 735 N.W.2d 882; *see, e.g., Torkelsen*, 2008 ND 141, ¶ 32, 752 N.W.2d 640; *Fields*, 2005 ND 15, ¶ 10, 691 N.W.2d 233. "An officer must set forth some facts for believing the evidence will be destroyed other than its mere existence." *Fields*, at ¶ 10; *see State v. Herrick*, 1997 ND 155, ¶ 21, 567 N.W.2d 336 (overruling a per-se rule allowing no-knock warrants in drug cases). Therefore, we conclude, a reasonably well-trained officer would know that this nighttime search warrant, which lacked in indicia of probable cause that the contraband would be easily destroyed or quickly removed from the residence, was invalid, and law enforcement's reliance on this nighttime search warrant was not objectively reasonable. Thus, the good-faith exception to the federal exclusionary rule does not apply in this case.

[¶ 53] Because we conclude the good-faith exception does not apply to federal exclusionary rule in this case, we need not address whether the state's exclusionary rule under the North Dakota Constitution recognizes a good-faith exception. *See State v. Lunde*, 2008 ND 142, ¶ 25, 752 N.W.2d 630.

b.

[¶ 54] The inevitable-discovery doctrine "establishes that evidence derived from information obtained in an unlawful search is not inadmissible under the fruit-of-the-poisonous-tree doctrine where it is shown that the evidence would have been gained even without the unlawful activity." *State v. Phelps*, 297 N.W.2d 769, 774 (N.D.1980). We noted a common criticism of the doctrine is that "a mechanical application of the inevitable-discovery doctrine could actually encourage unconstitutional shortcuts by law enforce-

ment officers in gathering evidence, thereby defeating the purposes of the exclusionary rule." *Wahl,* 450 N.W.2d at 715; *see Phelps,* 297 N.W.2d at 775. For this reason, under the North Dakota Constitution, we adopted a two-part test:

> First, use of the doctrine is permitted only when the police have not acted in bad faith to accelerate the discovery of the evidence in question. Second, the State must prove that the evidence would have been found without the unlawful activity and must show how the discovery of the evidence would have occurred.

*Phelps,* at 775 (adopting test articulated in Wayne R. LaFave, *Search and Seizure,* § 11.4, at 624 (1st ed.1978)).

[¶ 55] When a shortcut is taken that circumvents the requirements of the Fourth Amendment, the requirements of the inevitable-discovery doctrine have not been met. *See State v. Johnson,* 301 N.W.2d 625, 629 (N.D.1981). In *Johnson,* law enforcement had reason to believe the air compressor located on Neil Johnson's property was stolen. *Id.* at 626. Law enforcement entered his property without a warrant and seized the air compressor. *Id.* Our Court found law enforcement's actions violated Johnson's rights under the Fourth Amendment. *Id.* at 628. The State argued the inevitable discovery doctrine applied because the police had probable cause to search Johnson's property and, if they had procured a search warrant, the air compressor would have been lawfully seized. *Id.* at 629. However, our Court declined to extend the inevitable-discovery doctrine to the facts of that case, reasoning the exclusionary rule is designed to prevent and deter law enforcement shortcuts and the shortcut taken by law enforcement eliminated the requirements of the Fourth Amendment. *Id.*

[¶ 56] In *Handtmann,* 437 N.W.2d at 838, our Court declined to extend the inevitable-discovery doctrine "based upon an assumption that a subsequent search conducted pursuant to a hypothetical search warrant would have resulted in the discovery of the disputed evidence." In *Handtmann,* law enforcement executed a search warrant for Mark Handtmann's residence. *Id.* at 833. The warrant affidavit alleged that Handtmann had a "reputation of being 'suspected of trafficking narcotics.'" *Id.* at 835. The warrant affidavit also alleged a drug deal had occurred at Handtmann's residence based on the facts that (1) an individual had entered Handtmann's residence for approximately thirty minutes, (2) the individual then left the residence, and (3) the individual was subsequently arrested with marijuana in his possession. *Id.* at 832–33. Our Court concluded that, although the information contained in the affidavit "may have made the police suspicious about the presence of evidence of criminal activity at [Handtmann's residence], that suspicion, without anything more specific about [Handtmann], does not amount to probable cause to search [his residence]." *Id.* at 835. The State argued the inevitable discovery doctrine validated the search because "other evidence discovered after the warrant was issued" provided probable cause. *Id.* at 836. Our Court concluded the inevitable discovery doctrine did not apply and the illegally obtained evidence should be suppressed:

> The exclusionary rule requires suppression of evidence obtained in a search that violates the Fourth Amendment. Where there has been an unlawful search and seizure, the exclusionary rule operates as a judicial sanction against law enforcement intrusion into an individual's Fourth Amendment right to privacy. The exclusion of unlawfully obtained evidence serves two underlying

policy considerations: (1) compelling respect for the constitutional guaranty against unreasonable searches and seizures by removing the incentive to disregard that guaranty, and (2) bolstering judicial integrity by not allowing convictions based on unconstitutionally obtained evidence.

. . . .

The inevitable-discovery doctrine provides that evidence derived from information obtained in an unlawful search or seizure is not inadmissible under the fruit-of-the-poisonous-tree doctrine if it is shown that the evidence would have inevitably been discovered without the unlawful action. In *State v. Phelps*, this court held that the inevitable-discovery doctrine was a part of North Dakota law as an exception to the exclusionary rule and a necessary corollary of the fruit-of-the-poisonous-tree doctrine. We adopted the following two-part test for the application of the inevitable-discovery doctrine:

> "First, use of the doctrine is permitted only when the police have not acted in bad faith to accelerate the discovery of the evidence in question. Second, the State must prove that the evidence would have been found without the unlawful activity and must show how the discovery of the evidence would have occurred.... A showing that discovery might have occurred is entirely inadequate." *State v. Phelps, supra*, 297 N.W.2d at 775.

We decline to apply the inevitable-discovery rule in this case because its application would render the warrant protections of the Fourth Amendment meaningless. It is well established that a search warrant issued upon insufficient evidence cannot be validated by information known when the warrant was sought but not disclosed to the issuing magistrate. The State's assertion that it would have obtained a lawful search warrant based upon the information subsequently discovered would emasculate the requirement for a search warrant under the Fourth Amendment.

We have said that the inevitable-discovery doctrine may not be applied to encourage shortcuts by law-enforcement officials which eliminate a neutral and detached magistrate's probable-cause determination. Application of the inevitable-discovery doctrine in this case would encourage law-enforcement shortcuts whenever evidence may be more readily obtained by unlawful means—a result at odds with the purpose of the exclusionary rule to deter police from obtaining evidence in an illegal manner. Moreover, judicial sanctioning of the doctrine in this case would also encourage incomplete police investigations in the hope that information subsequently discovered would cure a defective warrant. We cannot legitimize that type of investigatory practice.

*Handtmann*, at 836–38 (citations and footnote omitted).

[¶ 57] Similarly, other jurisdictions adopting the bad-faith requirement to the inevitable discovery doctrine have held the inevitable discovery doctrine should not apply when law enforcement knowingly or intentionally violate the accused's rights. *See Smith v. State*, 948 P.2d 473, 481 (Alaska 1997). In *State v. Williams*, 285 N.W.2d 248, 259 (Iowa 1979), the Iowa Supreme Court stated that "bad faith means something more than just acting unlawfully ..." and cited to *Brown v. Illinois*, 422 U.S. 590, 605, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975) referring to "purposefulness" of illegal police conduct.

[¶ 58] In *Commonwealth v. Sbordone*, 424 Mass. 802, 678 N.E.2d 1184, 1190

(1997), the Massachusetts Supreme Court held:

> As a general rule, the mere fact that an unlawful search and seizure has occurred should not automatically result in the exclusion of any illegally seized evidence. The decision whether to exclude such evidence should properly turn on: (1) the degree to which the violation undermined the principles underlying the governing rule of law, and (2) the extent to which exclusion will tend to deter such violations from being repeated in the future.... [I]f the Commonwealth can demonstrate by a preponderance standard that discovery of the evidence by lawful means was certain as a practical matter, the evidence may be admissible as long as the officers did not act in bad faith to accelerate the discovery of evidence, and the particular constitutional violation is not so severe as to require suppression. (Quotation and citation omitted).

It is the burden of the State to prove an absence of bad faith. *Phelps*, 297 N.W.2d at 775.

[¶ 59] "[T]he provision of Rule 41(c) governing nighttime warrants implicates substantive constitutional rights, particularly the right to be free from unreasonably searches and seizures under the Fourth Amendment." *Roth III*, 2007 ND 112, ¶ 31, 735 N.W.2d 882. Further, a violation of the nighttime search warrant requirements "is tantamount to a violation of the Fourth Amendment." *Id.* Whether a nighttime search warrant is granted is based on the necessity for executing the warrant at a time other than daytime. *Torkelsen*, 2008 ND 141, ¶ 32, 752 N.W.2d 640. The legal requirement that to obtain a nighttime search warrant an officer must set forth a factual basis, other than the mere existence of the drugs, establishing the evidence would be quickly destroyed or easily removed is longstanding and well-established. *See id.; Roth III*, at ¶ 21; *Fields*, 2005 ND 15, ¶ 10, 691 N.W.2d 233.

[¶ 60] Here, at the October 27, 2011, suppression hearing, Deputy Graham admitted he went back to the magistrate and requested the search warrant be amended to allow for a nighttime search, without providing an additional warrant affidavit or sworn statements regarding the necessity for the nighttime provision. Further, he admitted the only justification for requesting the nighttime search warrant was the approximate time frame for when Holly would be arriving in Minot. He admitted officer safety was not a concern, and he did not testify at the suppression hearing that the evidence could be quickly destroyed or easily removed from Holly's residence or that there was reason to believe the drugs would be taken from the vehicle into the house. In fact, the only contraband alleged to be in the house was a "bong."

[¶ 61] We conclude the State failed to establish law enforcement did not act in bad faith to accelerate the discovery of evidence. Law enforcement knowingly disregarded the procedure required to procure a nighttime search warrant. Deputy Graham knew the original search warrant did not authorize a nighttime search. In requesting the search warrant be amended, Deputy Graham acknowledged he failed to establish any additional facts necessary to provide the separate probable cause needed for a nighttime search warrant. A reasonably well-trained officer would have known a search warrant failing to establish an indicia of probable cause that the drugs would be easily destroyed or quickly removed from the premises was invalid. Yet, here, law enforcement disregarded our well-established precedent regarding nighttime search warrants. The officers actions in this case, similar to the

actions of law enforcement in *Johnson*, 301 N.W.2d at 629, circumvented the protections afforded by the North Dakota Constitution. The State did not establish Deputy Graham did not knowingly violate the accused's rights.

[¶ 62] Therefore, we conclude North Dakota's inevitable-discovery doctrine should not apply because the State failed to show the officers did not act in bad faith when they knowingly disregarded search warrant procedure and longstanding and well-established case law to accelerate the discovery of evidence. To apply North Dakota's inevitable-discovery doctrine to this case would undermine the warrant protections set out in the Fourth Amendment of the United States Constitution and encourage law enforcement shortcuts.

## III

■ [¶ 63] Holly argues the trial court erred in denying his motion for a judgment of acquittal. He alleges the State failed to prove he did not have a valid prescription for the controlled substance, Psilocyn, and the schedule IV controlled substance. He also alleges the State failed to prove Testosterone Propionate is a schedule III controlled substance.

■ [¶ 64] A motion for a judgment of acquittal may be granted if the evidence is insufficient to sustain a conviction of guilt. *State v. Blunt*, 2010 ND 144, ¶ 12, 785 N.W.2d 909. We sustain a guilty verdict "if upon reviewing the evidence in a light most favorable to the verdict, we determine that there is substantial evidence to support it." *State v. Hammeren*, 2003 ND 6, ¶ 6, 655 N.W.2d 707.

## A

[¶ 65] A defendant may not be charged with possession of a controlled substance if he has "a valid prescription or order of a practitioner while acting in the course of the practitioner's professional practice." N.D.C.C. § 19–03.1–23(7). However, the Uniform Controlled Substances Act provides:

1. It is not necessary for the state to negate any exemption or exception in this chapter in any complaint, information, indictment, or other pleading or in any trial, hearing, or other proceeding under this chapter. *The burden of proof of any exemption or exception is upon the person claiming it.*

2. In the absence of proof that a person is the duly authorized holder of an appropriate registration or order form issued under this chapter, the person is presumed not to be the holder of the registration or form. *The burden of proof is upon the person to rebut the presumption.*

N.D.C.C. § 19–03.1–37 (emphasis added).

[¶ 66] Therefore, it was Holly's burden to produce a valid prescription and, in the absence of such evidence, it is presumed a valid prescription does not exist. The record does not contain any evidence that Holly had a valid prescription. We conclude the evidence was sufficient to sustain a finding of guilt for possession of Psilocyn; possession of a schedule IV controlled substance; and one count of possession of drug paraphernalia, other than marijuana.

## B

[¶ 67] Holly argues the State failed to prove the Testosterone Propionate is a controlled substance under N.D.C.C. ch. 19–03.1. This issue need not be addressed, as the Testosterone Propionate and all other evidence seized from Holly's residence must be suppressed.

## IV

██ [¶ 68] Holly argues the trial court erred in, sua sponte, finding him guilty of a lesser-included offense. Holly argues possession of marijuana is not a lesser-included offense to possession with intent to deliver and the trial court may not make such a finding without a motion by either party. Holly waived his right to a jury trial, and a bench trial was held.

██ [¶ 69] Rule 31(c), N.D.R.Crim.P., allows a jury to find a defendant guilty of an offense necessarily included in the offense charged. When a defendant waives his right to a jury trial, the judge substitutes for the jury in all respects. *State v. Morris*, 316 N.W.2d 80, 82 (N.D.1982). Therefore, a trial court may find a defendant guilty of a lesser-included offense as "[t]here is no sound rationale for holding that Rule 31(c) applies to only jury trials." *Morris*, at 83.

[¶ 70] The holding in *Morris* allows a judge in a bench trial to, upon request from either party, find the defendant guilty of a lesser-included offense. However, it does not answer the question as to whether the trial court may consider the lesser-included offense absent a request by either party.

[¶ 71] Consistent with allowing the trial court to instruct the jury on a lesser-included offense absent either parties' request, other courts have allowed a trial court in a bench trial to, on its own, find a defendant guilty of a lesser-included offense. In *In re Nathan L.*, 146 N.H. 614, 776 A.2d 1277, 1281 (2001), the New Hampshire Supreme Court held "a trial court has the discretion to raise a lesser-included offense sua sponte at the conclusion of the trial for submission to the jury or to consider it as the trier of fact in a non-jury trial." The court reasoned that a jury's function as a trier of fact is analogous to a judge's function as the trier of

fact in a bench trial. *Id.* at 1279–80. Further, the court said, a trial court "has an independent responsibility to determine the law to be applied in each case. In exercising that responsibility, the court must be able, either in reaching a verdict as the trier of fact or instructing the jury, to consider appropriate lesser-included offenses." *Id.* at 1281.

[¶ 72] Similarly, in *State v. James*, 265 Neb. 243, 655 N.W.2d 891, 896 (2003), the Nebraska Supreme Court held:

> [T]he defendant does not need to raise the issue in order for the trial court to consider lesser-included offenses. If the evidence adduced at trial would warrant conviction of the lesser charge and the defendant has been afforded a fair notice of those lesser-included offenses, the trial court may consider the lesser-included offense.

██ [¶ 73] In *Morris*, we concluded a defendant can be found guilty of a lesser-included offense, which was not charged in the complaint, and the defendant is not deprived of his Sixth Amendment right to notice of the charges against him. 316 N.W.2d at 83. Further, a trial court is allowed to instruct the jury, sua sponte, of a lesser-included offense. *State v. Keller*, 2005 ND 86, ¶ 31, 695 N.W.2d 703. We cannot discern any basis for concluding that a trial court in a bench trial would not have the authority, on its own, to consider a lesser-included offense.

██ [¶ 74] The inquiry does not end there, however. A lesser-included offense must be appropriate under the circumstances:

> We apply an elements-of-the-offense analysis. For an offense to be a lesser included offense, it must be impossible to commit the greater offense without committing the lesser. For a lesser-included-offense instruction, there must

be evidence on which a jury could rationally find beyond a reasonable doubt that the defendant is not guilty of the greater offense and to find beyond a reasonable doubt that the defendant is guilty of the lesser.

*Id.* (citations omitted).

[¶ 75] We have said, conviction of possession with intent to deliver encompasses simple possession:

> To convict an accused of unlawful possession of marijuana, the State must prove (1) the accused had possession of marijuana. To convict an accused of possession of marijuana with intent to deliver, the State must prove in addition to (1) that (2) the accused possessed the marijuana with the intent to deliver it.

*State v. Morris,* 331 N.W.2d 48, 53 (N.D. 1983) (citation omitted); *see State v. Rodriguez,* 454 N.W.2d 726, 730 (N.D.1990); *State v. Michlitsch,* 438 N.W.2d 175, 180 (N.D.1989) (affirming convictions of simple possession as a lesser offense to possession with intent to deliver).

[¶ 76] Because possession with intent to deliver requires the essential elements of simple possession, a person could not commit the greater offense without committing the lesser offense. Therefore, the trial court did not err in finding, sua sponte, Holly guilty of possession of marijuana as a lesser-included offense to possession of marijuana with intent to deliver.

## V

[¶ 77] We affirm in part, reverse in part, and remand. We affirm the criminal judgments which are based on the evidence found in Holly's vehicle. We reverse the criminal judgments which are based on the evidence found in his residence. We remand for the trial court to amend the order denying Holly's motion to suppress and the criminal judgments consistent with this opinion.

[¶ 78] GERALD W. VANDE WALLE, C.J., CAROL RONNING KAPSNER, J., concur.

CROTHERS, Justice, concurring in part and dissenting in part.

[¶ 79] I concur with the majority decision except portions of Part II D relating to inevitable discovery and the suppression of evidence. From those portions, I respectfully dissent as explained below.

[¶ 80] The Fourth Amendment to the United States Constitution provides: "The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated; and no warrants shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." The Amendment does not address execution of warrants at night, and we must be guided by precedent to decide whether a particular search was lawful.

[¶ 81] Here, law enforcement sought and obtained warrants to search Holly's vehicle and home. After the judge issued what we have confirmed were valid search warrants, law enforcement learned Holly would return to Minot later that evening. Obviously mindful that execution of search warrants at night need explicit authorization, Deputy Graham contacted the judge, and the court approved nighttime execution of both the vehicle and the home warrants. The deputy was not sworn, and no record was made of his statements to the judge, which of course does not comply with the legal requirements for obtaining any warrant for a search at any time. N.D.R.Crim.P. 41(c); Majority opinion at ¶ 39. We all agree that both the deputy and the judge failed to follow established law. *Id.*

[¶ 82] Judicial authorization was received at the same time for nighttime execution of both the home and the vehicle warrants. Authorization for nighttime execution of neither warrant was supported by a showing of "separate probable cause." *State v. Torkelsen,* 2008 ND 141, ¶ 32, 752 N.W.2d 640 (citing *State v. Fields,* 2005 ND 15, ¶ 9, 691 N.W.2d 233). Yet we uphold the nighttime vehicle search based on the recognized exigency that vehicles are inherently mobile and the suspected contraband "would not be expected to be in Holly's vehicle the following day or might be removed if the search was delayed to daytime." Majority opinion at ¶ 43.

[¶ 83] What is not recognized is that Holly and his traveling companion were seized immediately upon their arrival at Holly's residence in Minot. The search warrants for the vehicle and residence were executed upon Holly's seizure at 10:14 p.m.—a mere 14 minutes after the apparently inflexible, one size fits all, rule crafted by this Court that "daytime" ends at 10:00 p.m. N.D.R.Crim.P. 41(h)(2)(B). With their subsequent arrest, Holly and his roommate/travel companion were not in the residence. A rational person might fairly conclude Sesseman, the remaining roommate and citizen informant, was not asleep during execution of the warrants that his information and participation helped procure. Therefore, the articulated basis for limiting nighttime searches also seems to fail in this case. *See Fields,* 2005 ND 15, ¶ 9, 691 N.W.2d 233 ("The purpose of Rule 41(c), N.D.R.Crim.P., is to protect citizens from being subjected to the trauma of unwarranted nighttime searches."); *State v. Schmeets,* 278 N.W.2d 401, 410 (N.D.1979) ("Courts have long recognized that nighttime searches constitute greater intrusions on privacy than do daytime searches."). *See also Ex parte Hendersen,* 27 N.D. 155, 162, 145 N.W. 574, 576 (1914)

("When the reason for the rule fails, the rule itself should fall, is the statute of our state as well as the course dictated by common sense.").

[¶ 84] I recite these facts and the reasons articulated for our law on nighttime execution of warrants not to erode a citizen's right of privacy in their residence. Rather, these details become important when this case is examined through the lens of good faith and inevitable discovery.

[¶ 85] The majority concludes that the lack of a record establishing separate probable cause to search the residence at night is the lack of good faith for application of the good-faith exception. Majority opinion at ¶ 48. I am compelled to join that conclusion because a reasonably trained officer and judge should know the requirements under North Dakota's well-established law. However, what I do not join is the majority's apparent leap from the lack of good faith under the good-faith exception to a determination of bad faith under the inevitable discovery doctrine.

[¶ 86] This Court adopted the inevitable discovery exception to the exclusionary rule in *State v. Phelps,* 297 N.W.2d 769, 775 (N.D.1980). There, the Court stated:

"In order to apply the inevitable-discovery theory the State must meet a two-part test. First, use of the doctrine is permitted only when the police have not acted in bad faith to accelerate the discovery of the evidence in question. Second, the State must prove that the evidence would have been found without the unlawful activity and must show how the discovery of the evidence would have occurred."

*Id.* (footnote omitted).

[¶ 87] The inevitable discovery exception specifically examines whether law enforcement acted in bad faith in discovering

evidence. The test is not the absence of good faith but the presence of bad faith. A common definition of bad faith is "[d]ishonesty of belief or purpose." *Black's Law Dictionary* 159 (9th ed.2009). *See also State v. Steffes,* 500 N.W.2d 608, 613 (N.D.1993) ("Bad faith, as used in cases involving destroyed evidence or statements, means that the state deliberately destroyed the evidence with the intent to deprive the defense of information; that is, that the evidence was destroyed by, or at the direction of, a state agent who intended to thwart the defense.").

[¶ 88]   The majority cites *State v. Johnson,* 301 N.W.2d 625 (N.D.1981) and *State v. Handtmann,* 437 N.W.2d 830 (N.D.1989) in support of its holding.   In *Johnson,* officers made a warrantless entry on the defendant's property to seize what police thought was stolen property.   *Id.* at 626. Warrantless searches and seizures are presumptively unreasonable unless they fall within a recognized exception to the warrant requirement.   *Id.* at 628.   On inevitable discovery, the Court in *Johnson* stated:

> "If the inevitable discovery theory applied when a shortcut was taken, as in the instant case, the net result would be that the magistrate's determination of probable cause as required by the fourth amendment would be eliminated for all practical purposes.   This we cannot do.
>
> "In no instance is this type of shortcut more apparent than in the present case in which the warrant requirement was bypassed in the absence of exigent circumstances.   We conclude that the requirements of the inevitable discovery doctrine have not been met in this case."

*Id.* at 629.   *Johnson* is factually and legally dissimilar to Holly's situation.   Therefore, the holding in *Johnson* relied on by the majority is unhelpful in resolving the present case.

[¶ 89]   The *Handtmann* decision is a closer case, but ultimately different than the present situation because the warrant in *Handtmann* was invalidated due to "concededly false information" and unsubstantiated information from a confidential informant.   437 N.W.2d at 834–35.   Unlike the situation in *Handtmann,* the present warrant was defective not because it lacked probable cause for issuance but because it lacked a record showing the magistrate was given separate probable cause justifying nighttime execution.

[¶ 90]   Finally, the majority warns we must guard against "mechanical application of the inevitable-discovery doctrine." Majority opinion at ¶ 54.   Yet they conflate the lack of good faith with bad faith when an otherwise lawful warrant was executed 14 minutes later than authorized by court rule.   Other than that infraction, the majority confirms the warrants to search both Holly's vehicle and residence were valid.   Holly's residence could have and would have been searched using that valid warrant.   The legal defect at issue in this appeal was nighttime execution of the warrant to search the residence.   No evidence shows law enforcement acted in bad faith procuring authorization to execute the warrant "anytime."   Nor does the record support a conclusion that law enforcement's execution of the warrant at 10:14 p.m. was motivated by or accomplished with bad faith.   Therefore, I would hold that the State satisfied its burden that the inevitable discovery exclusion applies and that the fruits of the residential search accomplished pursuant to warrant should not be suppressed under the facts of this case.

[¶ 91]   Daniel J. Crothers

SANDSTROM, Justice, dissenting.

[¶ 92]   As the United States Supreme Court has said repeatedly, "The touch-

stone of the Fourth Amendment is reasonableness." *See, e.g., Florida v. Jimeno,* 500 U.S. 248, 250, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991). Here the majority holds the search of the vehicle sitting in the driveway of the house was reasonable but the search of the house was not. The magistrate had determined there was probable cause to believe drugs and other evidence were inside the house, so once the search of the vehicle began in the driveway, one of two things was going to happen—those inside the house were going to remove or destroy the drugs and other evidence, or, as Justice Crothers concludes, they were inevitably going to be discovered.

[¶ 93] The magistrate had originally authorized a daytime search but modified the warrant to permit a nighttime search. For reasons that are not clear, there is no recording of what transpired when the officer went back to the judge when the warrant was modified. The reasoning of the Chief Justice in his concurrence in *State v. Fields,* 2005 ND 15, ¶ 18, 691 N.W.2d 233, appears to apply here:

> I write separately to note that while we reject the per-se presumption that drugs are "easily disposed of" to justify either the "no-knock" or nighttime search warrant, the term "easily disposed of" has significantly different temporal meanings in the two contexts. In the "no-knock" warrant the term "easily disposed of" refers to the ability to dispose of drugs in the very brief time between the knock and the entry if a knock were required. In the context of the nighttime search warrant the time which would elapse between execution and the entry, if no nighttime search warrant were issued, is much greater and the term "easily disposed of" logically refers to disposition other than, for example, flushing down the toilet or swallowing the drug. Thus evidence that a subject of a search warrant consumed or delivered drugs within a few hours of their receipt or made deliveries in the nighttime hours would justify issuance of a nighttime search warrant.

[¶ 94] The high risk of destruction of the drugs in the house while the vehicle was being searched in the driveway provides the touchstone of reasonableness of the nighttime search warrant here. On the other hand, if it does not, then Justice Crothers is correct, and they would have been inevitably discovered. I would affirm.

[¶ 95]   Dale V. Sandstrom